# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CASE NO. 4:14-CR-158 |
| | § | Judge Mazzant |
| JAMES HEMEN (2) | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant James Hemen's Motion for New Trial (Dkt. #115). Having considered the motion, the response, and the relevant documents, the Court is of the opinion that the motion should be granted.

## BACKGROUND

This case concerns Kehinde Ajileye (also known as Sammy Lewis, Samuel AJ Lewis, and additional aliases not identified in the indictment, hereafter referred to as "Mr. Ajileye"), Defendant James Hemen (also known as James Ohemeng), and Remmossive Latuna Selmon (also known as Renee Lewis and additional aliases not identified in the indictment, hereafter referred to as "Ms. Selmon").

Defendant hails from Accra, Ghana, and came to the United States sometime in the 1980s. He became a naturalized United States citizen in 1992, studied and obtained a bachelor's degree. Defendant was issued a pharmacist license in 1993. Defendant worked as a pharmacist at CVS in Dallas, Texas, from 2004 until 2011. During this time, Defendant was disciplined by the Texas State Board of Pharmacy for failure to properly supervise an employee who engaged in pharmacy technician duties without a registration for several months while Defendant was the "pharmacist-in-charge." Defendant left CVS and started "Accent Pharmacy 1" in Carrollton, Texas in January of 2011. Some documents later describe that Defendant, Mr. Ajileye, and Ms. Selmon were co-owners of Accent Pharmacy 1, but it appears that Defendant owned Accent Pharmacy 1, at least at its inception, and Mr. Ajileye and Ms. Selmon were hired later that year.

In the fall of 2012, Defendant began working as a full-time pharmacist at Parkland Hospital in Dallas, Texas, but Defendant continued representing to the Texas State Board of Pharmacy that he was the pharmacist-in-charge of Accent Pharmacy 1 and an "Accent Pharmacy 2" (which, according to testimony, was registered with the Drug Enforcement Administration ("DEA") in November 2011).

In May of 2013, a DEA investigator inquired into the operation of Accent Pharmacy 1. Testimony presented at trial established that Mr. Ajileye presented himself to the investigator as "Dr. Lewis." Evidence established that Dr. Lewis was a false identity of Mr. Ajileye, and that, though he held himself out as a physician and a pharmacist, he was never licensed by the State of Texas in any regard. Investigation further discovered that Ms. Selmon held herself out as a pharmacy technician, but was also not licensed in any capacity. The investigator discovered the existence of a second pharmacy, Accent Pharmacy 2, in Plano, Texas, but at the time of its discovery no activity appeared to be occurring, or to have ever occurred, at that location.

The DEA Dallas Field Division executed a search warrant on Accent Pharmacy 1 on August 9, 2013. During the search, the officers made contact with Defendant and asked him to come to the premises. Defendant communicated with a Special Agent Dunn. After conversation regarding the pharmacies, Defendant was given, and signed, a Voluntary Surrender of Controlled Substance Privilege for Accent Pharmacy 1 and 2.

Defendant described, in his motion for judgment of acquittal, the trial testimony of Agent Dunn:

> Special Agent Dunn's testimony revealed two misrepresentations by Mr. Hemen regarding his presence, or lack thereof, at the pharmacy during critical operating hours. Dunn also testified that Mr. Hemen was aware that his co-defendant "Dr. Sammie Lewis" was not licensed in Texas and that neither Sammie Lewis' nor Remmossive Lewis' required licenses were displayed in the pharmacy. When asked by Dunn why he turned over the pharmacy to two unlicensed individuals, Mr. Hemen replied that he was having problems getting the pharmacy off the ground and that he needed to work at Parkland Hospital. However, these statements and admissions fall far short of confessing to participation in the

charged conspiracy. Mr. Hemen's statements are confessions to administrative violations which prompted him to surrender his license for such administrative violations.

(Dkt. #114 at pp. 6-7). On October 8, 2014, a grand jury indicted Kehinde Ajileye, Defendant James Hemen, and Remmossive Latuna Selmon. The individuals were indicted on one, singular count of conspiracy to manufacture, distribute, and possess with intent to manufacture and distribute a controlled substance, namely Hydrocodone, a Schedule III controlled substance, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1) (Dkt. #1).

On April 13, 2016, the Government filed a Notice of Plea Agreement as to Remmossive Latuna Selmon (Dkt. #65). On April 17, 2016, the Government filed a Notice of Plea Agreement as to Kehinde Ajileye (Dkt. #67).

From May 2, 2016, to May 6, 2016, the Court held a jury trial as to Defendant. Of relevance to the current motion, the Government presented evidence gathered at Accent Pharmacy 1 that a number of Hydrocodone pills, a Schedule III controlled substance during the time of the conspiracy, were purchased on behalf of Accent Pharmacy 1 and 2. The Government presented testimony that Accent Pharmacy 1 did not take the proper precautions to determine whether presented prescriptions were valid, that Mr. Ajileye had contacts who wrote invalid prescriptions in Houston, TX, that several break-ins were reported at Accent Pharmacy 1, and that, in Defendant's absence from Accent Pharmacy 1, Mr. Ajileye and Ms. Selmon were responsible for distributing Hydrocodone.

The uncontroverted evidence further demonstrated that around the time Defendant began working at Parkland Hospital, Defendant rarely came in to Accent Pharmacy 1, but talked to Mr. Ajileye regularly on the phone, and Ms. Selmon opened a new Capital One bank account and ran the operations of Accent Pharmacy 1 out of this account. Outside of a couple of relatively small payments to Defendant, the account was used to purchase a house in Mr. Ajileye's name and several vehicles in Mr. Ajileye's name.

Ms. Selmon testified at trial regarding her involvement, Mr. Ajileye's involvement, and Defendant's relationship with the two individuals and the operations of the pharmacy. Though she testified that other licensed pharmacists worked with Mr. Ajileye and Ms. Selmon, no evidence corroborated this testimony. Further, though she testified to witnessing a signed agreement between Defendant and Mr. Ajileye regarding operation of Accent Pharmacy, no evidence corroborated this testimony, no such document was presented, and the Government admitted to having no knowledge of such a document's existence. During trial, a variety of the Government's witnesses repeatedly called into question the potential credibility of any testimony from Mr. Ajileye. Though listed as a possible witness, the Government ultimately chose not to call Mr. Ajileye.

At the close of the Government's case-in-chief, Defendant moved for a judgment of acquittal on a lack of sufficient evidence under Federal Rule of Criminal Procedure 29. The Court reserved ruling on the motion. Defendant called one character witness, and then rested. The jury deliberated for an evening and a portion of the next day before returning a guilty verdict in the afternoon. Defendant then renewed his motion for judgment of acquittal.

On May 16, 2016, Defendant submitted his Motion and Brief for Judgment of Acquittal Rule 29(a) and (c), Fed. R. Crim. Proc. (Dkt. #114). On May 16, 2016, Defendant also submitted his Motion for New Trial Rule 33, Fed. R. Crim. Proc. (Dkt. #115). On May 24, 2016, the Government filed its Opposition to Defendant's Rule 29 Motion for Judgment of Acquittal (Dkt. #117), and Opposition to Defendant's Rule 33 Motion for New Trial (Dkt. #118). On May 27, 2016, Defendant filed a Reply to Government's Opposition to Defendant's Rule 29 Motion for Judgment of Acquittal (Dkt. #120).

## LEGAL STANDARD

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "In this

Circuit, the generally accepted standard is that a new trial ordinarily should not be granted 'unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.'" *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (quoting *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004)). "'A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant.'" *Id.* The power to grant a new trial "should be exercised infrequently by district courts, unless warranted by exceptional circumstances." *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (internal quotation and citation omitted).

A district court is "powerless to order a new trial except on the motion of the defendant." *United States v. Brown*, 587 F.2d 187, 189 (5th Cir. 1979). "[A] district court does not have the authority to grant a motion for a new trial . . . on a basis not raised by the defendant." *United States v. Nguyen*, 507 F.3d 836, 839 (5th Cir. 2007).

## ANALYSIS

A new trial is appropriate when there would be as miscarriage of justice or the weight of the evidence preponderates against the verdict. *Wright*, 634 F.3d at 775. In the present case, the Court is of the belief that both of these circumstances are implicated.

*Summary of Defendant's Motion for New Trial*

Defendant's motion for a new trial is based on the failure of the Government to present sufficient evidence that Defendant was part of a conspiracy with Ms. Selmon and Mr. Ajileye, as alleged in the Indictment (Dkt. #115 at p. 3). Defendant asserts that the testimony presented by the Government's witnesses merely supports the conclusion that Defendant "associated with his co-defendants regarding the sale of a pharmacy to said co-defendants who were, as it turned out, unlicensed to operate the pharmacy." (Dkt. #115 at p. 3). Defendant argues that statements given orally and in writing by Mr. Hemen to the investigating agents only prove administrative violations of the rules and regulations of the Texas State Pharmacy Board, and his surrender of

his pharmaceutical licenses reflected acknowledgement of the administrative rules rather than an admission of guilt (Dkt. #115 at p. 4). Defendant contends that the statements did not encompass the culpable mental state to "willfully" join the alleged conspiracy with "the intent to further its unlawful purpose."

Defendant, in particular, calls into question the credibility of Ms. Selmon's testimony and argues that she did not supply the link of Mr. Hemen's *mens rea*. Defendant contends that "[h]er attempts to provide the link by stating that Mr. Hemen and [Kehinde Ajileye] memorialized the unlawful conspiracy strains credibility by the nature of this testimony and her statements that she actually observed the contract at her house or office," and notes that "this alleged written agreement was never produced and never cited by any other witness." (Dkt. #115 at pp. 4-5).

Finally, Defendant summarizes his reason for seeking a new trial, stating: "The evidence in this case lacks sufficiency and credibility on the issue as to whether Mr. Hemen willfully joined in the charged conspiracy with the intent to further its unlawful purpose of distribution and dispensing of hydrocodone." (Dkt. #115 at p. 5).

Upon consideration of the Government's response it is clear, however, that the parties are talking past each other. Defendant focuses his arguments on the issue of the weight of the evidence relating to Defendant's mental state in the joining of the charged conspiracy. The Government, in contrast, focuses on the characterization of the conspiracy. The Government states:

> This is not a case of the Government prosecuting Hemen for guilt by association, or for merely being present at the scene of the crime. Rather, Hemen's role in this conspiracy is significant and integral. He is the linchpin. It was his pharmacy, his pharmacy license, his pharmacist license, and his DEA registrations that made this crime possible. Without access to those resources and to Hemen's advanced education, special skill, and position of trust as a licensed pharmacist, this conspiracy could never materialize or continue undetected for nearly two years.
>
> Hemen's role in this conspiracy is analogous to a property owner who conspired to use his property with other associates to conduct an illegal marijuana grow operation. . . . Both the property owner and the grow house operators are critical

> to the success of the enterprise. And the fact that the grow house owner is on the premises far less than the operators, if present at all, does not shield him from criminal liability. Similarly, how the conspirators distribute the proceeds generated by the grow house, or whether they have some other *quid pro quo* arrangement, does not lessen their respective individual culpability.

(Dkt. #118 at pp. 4-5). This line of logic challenges causation, that but for the Defendant, his alleged co-conspirators could not have carried out the illegal distribution of Hydrocodone. What this reasoning does not do is address the question of Defendant's mental state in joining in the alleged conspiracy.

The confusion appears to stem from the parties having two different conceptions of the conspiracy. The Court is of the opinion that the Defendant was charged with a level of generality that, regardless of intent to do so, has silently allowed two different charges to proceed forward in the guise of a single conspiracy.

*The Charged Conspiracy*

The Indictment recites that "21 U.S.C. § 841 made it a crime for any person to knowingly or intentionally 'manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance.' 21 U.S.C. § 846 made it a crime to attempt to violate 21 U.S.C. § 841 or conspire with others to do so." (Dkt. #1 at p. 3). Further, "[f]ederal law created a limited exception to 21 U.S.C. § 841 for certain licensed medical practitioners who possessed, manufactured, distributed, or dispensed controlled substances in connection with legally authorized medical or research activities. Medical practitioners, including physicians, pharmacists, and pharmacy technicians, were prohibited from distributing or dispensing controlled substances unless expressly authorized by law to do so and only in compliance with applicable rules, regulations, and laws of the State(s) where the practitioner was licensed to practice." (Dkt. #1 at p. 3).

The Indictment also presents, importantly, Section 562.056(a) of the Texas Occupations Code, which provides that "[b]efore dispensing a prescription, a pharmacist shall determine, in the exercise of sound professional judgment, that the prescription is a valid prescription," and Title 22 of the Texas Administrative Code, § 281.7, which provides that it is "unprofessional conduct" for one engaged in the practice of pharmacy to dispense a prescription drug order not issued for a legitimate medical purpose or in the usual course of professional practice, including dispensing controlled substances or dangerous drugs in violation of State and Federal laws regulating controlled substances (Dkt. #1 at pp. 4-5).

The singular count of conspiracy states:

> Beginning in or about January 2012, and continuing through in or about August 2013, the exact dates unknown, in Denton County, Texas, in the Eastern District of Texas, and elsewhere, KEHINDE AJILEYE, JAMES HEMEN, and REMMOSSIVE LATUNA SELMON, defendants herein, did knowingly and intentionally conspire, combine, and agree with each other and with others known and unknown to the Grand Jury, to manufacture, distribute, and dispense and possess with the intent to manufacture, distribute and dispense, outside of the usual course of professional practice and not for a legitimate medical purpose, a controlled substance, that is, Hydrocodone, a Schedule III controlled substance, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1).

(Dkt. #1 at p. 5). The "Manner and Means of the Conspiracy" presented in the Indictment read:

> It was part of the manner and means of the conspiracy that AJILEYE, HEMEN, and SELMON agreed to establish Accent Pharmacy *for the purpose of illicitly purchasing and dispensing Hydrocodone, Alprazolam, Promethazine with Codeine, and other controlled and non-controlled substances outside the usual course of professional pharmacy practice.* The Defendants agreed that AJILEYE and SELMON would and did manage and operate the pharmacy and serve as pharmacists and pharmacy technicians without possessing any valid licensure, qualifications, or legal authority to do so. It was further part of the manner and means of the conspiracy that HEMEN would and did falsely represent to the Texas State Board of Pharmacy and others that he functioned as the Pharmacist-in-Charge of Accent Pharmacy, knowing that he was not doing so, rarely visited the pharmacy, and made no meaningful effort to supervise the work of AJILEYE, SELMON, and other unlicensed employees at the pharmacy. AJILEYE and SELMON would and did pose as credentialed pharmacy professionals, including alternatively holding themselves out to be physicians, pharmacists, and/or a

pharmacy technicians, while operating the pharmacy, filling prescriptions received from patients or other medical facilities, ordering controlled and non-controlled drugs from pharmaceutical drug suppliers, and interacting with the public, drug suppliers, and regulatory authorities. Moreover, AJILEYE and SELMON would and did make unlawful wholesale drug purchases from drug suppliers, including Harvard Drug Group, on behalf of Accent Pharmacy. In an effort to conceal their criminal conduct, the Defendants did not report the controlled substances dispensed by Accent Pharmacy to the Texas Department of Public Safety as required by law.

All in violation of 21 U.S.C. § 846.

(Dkt. #1 at pp. 5-6) (emphasis added).

One conception of the alleged conspiracy is that the three named defendants joined together to establish and run Accent Pharmacy 1 for an illegal end—to profit from the distribution of Hydrocodone to individuals who did not have a valid prescription—that is, outside of the normal order of the business of running a pharmacy. It is in relation to this alleged conspiracy, and specifically Section 562.056(a) of the Texas Occupations Code listed in the Indictment (concerning the pharmacist's responsibility to determine the validity of a prescription), that the testimony of officers and experts on the validity of certain prescriptions filled by Accent Pharmacy 1 would be relevant, including: factors related to the origin of the prescriptions (Mr. Ajileye's Houston connections, for example), the likelihood that those prescriptions were written validly by a medical professional acting appropriately in his professional capacity, the inordinate amount of Hydrocodone purchased and prescriptions filled, and the number of possible break-ins in which Hydrocodone may or may not have gone missing. These happenings were presented as evidence by the Government at trial in an attempt to demonstrate, beyond a reasonable doubt, "the indisputable illegal operation of Hemen's pharmacies." (Dkt. #118 at p. 5). In this conception, Defendant's knowledge regarding the license of Mr. Ajileye or the various ways in which Defendant may have failed to regulate the

operation of the pharmacy may have been presented as evidence of the dishonesty and illegitimacy of the pharmacy's operations, but would be largely beside the point. Had these same actions been taken by validly licensed pharmacists and pharmacy technicians, the conspiracy would remain as long as Defendant willfully joined in the conspiracy through an agreement to illegally distribute Hydrocodone.

It is this conception of the conspiracy that Defendant challenges, and presumably why Defendant's brief focuses on the near-threadbare evidence of Defendant's agreement with the co-defendants; namely, the testimony of Ms. Selmon and statements of Defendant that reflect the relationship of Defendant to Mr. Ajileye. Defendant's arguments focus on his ability to observe the workings of the pharmacy considering his lack of presence in the pharmacy, the existence of Mr. Ajileye and Ms. Selmon's Capital One bank account separate from the Defendant, potential forgeries done by Mr. Ajileye, and the indicia of profits from this enterprise that flowed to Mr. Ajileye and Ms. Selmon and the lack of profits that appear to flow to Defendant.

For the first time in these proceedings it has been made clear to the Court, however, that the Indictment is vague and expansive enough to be interpreted as alleging a second, distinct conception of the conspiracy. In this second alleged conspiracy, the distribution of Hydrocodone is illegal merely because the distributors were not properly licensed and because a pharmacist-in-charge was not present at all times that Hydrocodone was being distributed. The "unlawful purpose" of this conspiracy has nothing to do with the validity of the prescriptions or possible disappearances of Hydrocodone during break-ins. In fact, under this theory of conspiracy, state regulatory laws form the basis of the charge such that any pharmacist who is aware of, and does not immediately act upon, any regulatory violation involving his pharmacy or one of his employees enters into a criminal conspiracy to violate federal controlled substances laws. The

actual distribution is of no significance, because any continuance in running the pharmacy would implicate the agreement to further the agreed-upon unlawful purpose of the conspiracy, that is, the distribution of substances, which would almost certainly include controlled substances, outside the "usual course of professional practice."

If this were the nature of the charged conspiracy, Defendant should have been given the opportunity to object to the inclusion of evidence and testimony regarding the presence of fraudulent prescriptions, of doctors potentially violating their professional obligations in places such as Houston, of the pharmacy profits and the fruits of those profits as being more prejudicial than probative. Under this conception, the threshold of operation outside the "usual course of professional practice" need only describe regulatory violations, rather than whether, in all practical regards, the pharmacy operated as a typical, legitimate pharmacy, or whether the pharmacy was a "pill mill," a shortcut to distributing Hydrocodone for unlawful profits. It is only under this theory of conspiracy that statements made or actions taken by Defendant that suggest knowledge of regulatory failures (namely, the continuous presence of a pharmacist-in-charge, and the lack of proper licensure of Mr. Ajileye and Ms. Selmon), could be potentially considered full admissions of guilt. The Government made references to this theory at trial, but it appeared to the Court that these statements were made to suggest that Defendant's admission of regulatory failure suggested admission and knowledge of the full scope of action, if not the details, taken by Mr. Ajileye, and Ms. Selmon. Now, however, it appears that the Government contends that the charged conspiracy does not turn on these implications, but on a very simple set of questions: (1) Did Defendant know of any regulatory violations involving the co-defendants and the operation of Accent Pharmacy 1; (2) did the Defendant cease operation of the pharmacy and the employment of Ms. Selmon and Mr. Ajileye at the moment he came to know

of any regulatory violations, or did he enter into an "agreement" that allowed the pharmacy to continue to operate; and (3) did the individuals, at any time following this "agreement," distribute or, rather, intend to distribute Hydrocodone?

The Government argues that Mr. Hemen is not charged with guilt by association, but rather, like a landowner who conspires to use his land to grow marijuana, his contribution and facilitation amounts to criminal liability. However, this is not a fair comparison to the current case wherein the contribution of Defendant was not land for the specific purpose of illegally growing marijuana, but a pharmacy, an institution that exists expressly to distribute drugs legally to those who have valid prescriptions. In the Government's analogy, there would be no legitimate, legal end possible in providing land for the growth of marijuana. In running a pharmacy, however, there is the legitimate end for running a legal, standard pharmacy business. A different comparison is perhaps more appropriate: a property owner who does not report that people he has entrusted to plant crops on his land have not properly complied with proper regulations regarding the use of a particular fertilizer, but upon involvement of and discovery by a regulatory body, comes to learn that the workers planted, in addition to legal crops, a crop of marijuana. This owner could be held accountable for joining in an agreement to overlook and even conceal regulatory violations, but could not be said to have joined in an agreement to further the unlawful purpose of illegally growing marijuana.

It is the Court's view that the Government now argues for an interpretation of drug conspiracy law that approaches strict liability for pharmacy regulatory violations because the business of pharmacies involves the distribution of controlled substances, and any pharmacy operating with a regulatory violation could be said to be operating outside the "usual course of professional practice. Such a theory would equate under the law a pharmacist who allows an

employee who has fallen behind on regulatory issues, such as continuing education hours, to a pharmacist and employees who violate all medical and ethical codes by filling clearly invalid prescriptions and exploiting the authority of their positions in order to gain a windfall of profit. Based on a cursory understanding of the Texas State Board of Pharmacy's regulatory actions regarding pharmacists who have made regulatory errors, it is the Court's suspicion that such an interpretation would expand federal criminal conspiracy liability to a tremendous degree, unconceived of by lawmakers or by the boards of pharmacy across the nation.

Even the Government draws some distinction between administrative violations versus a drug conspiracy, arguing that Defendant "knew from personal experience the limited penalties applicable to administrative violations. The trial testimony of Inv. Jones and TSBP records established that [Defendant's] punishment for his last administrative violation was a $500 fine." (Dkt. #117 at p. 19). The Government states that the present matter "was a whole different realm of misconduct," but does not draw any sort of meaningful line between administrative violations and criminal conspiracy. The Court would suggest that the appropriate line of demarcation is the individual's intent to further the specific "unlawful purpose" of the agreement.

Whether or not a theory of conspiracy law that relies solely on demonstration of covering regulatory violations is valid or invalid under the law is not before the Court. The Court cannot consider issues related to the inclusion of any evidence or testimony at trial or whether further instructions should have been given to the jury regarding the possible existence of, and Defendant's culpability with respect to, two distinct conspiracies. The only issue raised by Defendant is whether the weight of the evidence supports the verdict. The Court does not base any of its analysis in determining the proper result of Defendant's Motion for a New Trial on any

other basis. Rather, the Court feels it is necessary to describe the conspiracy charged, and, in particular, the "unlawful purpose" of the conspiracy.

Courts have previously identified the particular "unlawful purpose" of a charged conspiracy, especially when describing the "common goal" in analysis of the existence of one or more conspiracies. *See, e.g. United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995) (citing *DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989)) ("Everyone alleged to be part of the same single conspiracy must share a common goal. 'Where the evidence demonstrates that all of the alleged co-conspirators directed their efforts towards the accomplishment of a single goal or common purpose then a single conspiracy exists.'"). In *Morris*, the Fifth Circuit defined that the common goal of the conspiracy was "to derive personal gain from the illicit business of buying and selling cocaine." 46 F.3d at 415. In *United States v. Olguin*, the Fifth Circuit defined the common goal as "the distribution of drugs in the Dallas/ Fort Worth area." 643 F.3d 384, 395 (5th Cir. 2011).

The Court does not intend to enter into parsing between two conspiracies. "The existence of a single conspiracy will be inferred where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture, where there are several parts inherent in a common plan." *Id.* (citing *United States v. Mitchell*, 484 F.3d 762, 770 (5th Cir. 2007)). Rather, to determine the issue before the Court, the Court need describe with some particularity the specific unlawful purpose of the alleged agreement, rather than generalize to any unlawful purpose.

The Court finds that the unlawful purpose of the conspiracy charged was clearly to profit from the illegal purchase and distribution of Hydrocodone. The Court is unconvinced of a more general purpose to avoid regulatory penalties associated with improper oversight and failure to adhere to pharmacy standards of operation, which would, by the nature of the pharmacy business, only incidentally include the distribution of Hydrocodone.

*The Court's Instructions*

The Court charged that in order for the jury to find the defendant guilty of the crime of conspiracy, the Government must prove each of the following beyond a reasonable doubt:

*First*: That two or more persons, directly or indirectly, reached an agreement to distribute or dispense, or to possess with the intent to distribute or dispense, specifically Hydrocodone, outside the usual course of professional practice or not for a legitimate medical purpose;

*Second*: That the defendant knew of the unlawful purpose of the agreement; and

*Third*: That the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose.

In response to Defendant's specific challenge, the Court turns to the evidence presented by the Government that tended to show that Defendant possessed the culpable mental state to "willfully" join the alleged conspiracy; that is, "with the intent to further its unlawful purpose."

On a motion for judgment of acquittal under Rule 29, the Court is required to approach the evidence from a standpoint most favorable to the Government and to assume the truth of the evidence offered by the prosecution. In considering the veracity of a witness, the Court should not usurp the role of the jury as the arbiter of credibility of witnesses. Yet, even when considering testimony under the more deferential Rule 29 standard, the Fifth Circuit has stated that there are circumstances in which the court can properly discount the testimony, namely when the testimony is "unbelievable on its face." *United States v. Cravero*, 530 F.2d 666, 670 (5th Cir. 1976). A Rule 33 motion affords the Court more discretion to "weigh the evidence" and "assess the credibility of the witnesses during its consideration of the motion for new trial." *Tarango*, 396 F.3d at 672 (citing *United States v. Robertson*, 110 F.3d 1113, 1120 n. 11 (5th Cir. 1997)).

Defendant calls into question the credibility of Ms. Selmon's testimony, and argues that she did not supply the link of Mr. Hemen's *mens rea*. Defendant contends that "[h]er attempts to

provide the link by stating that Mr. Hemen and [Kehinde Ajileye] memorialized the unlawful conspiracy strains credibility by the nature of this testimony and her statements that she actually observed the contract at her house or office," and notes that "this alleged written agreement was never produced and never cited by any other witness." (Dkt. #115 at pp. 4-5).

The Court, careful to tread lightly on the territory reserved for the jury, discusses herein Ms. Selmon's testimony extensively to demonstrate that, though the testimony was thorough, the only testimony describing the extent and scope of any "agreement" between Defendant and Ms. Selmon and Mr. Ajileye, only casually connected Defendant to the distribution of Hydrocodone. The Court highlights that Ms. Selmon testified to very little regarding first-hand knowledge of the interaction between Mr. Ajileye and Defendant, almost nothing regarding her interaction with Defendant, and nothing concerning Defendant's knowledge of illegal actions taking place in the pharmacy, namely, an unusually high ordering and distribution of Hydrocodone, the filling of invalid scripts, or even the regulatory status of the pharmacy and the workers.

The testimony that Ms. Selmon did provide was often inconsistent and minimized her role in any conspiracy. At first, she testified that she helped her "partner" [Mr. Ajileye] with operating the business "as a cashier, filing, answering phones." When asked if those duties evolved over time or if she performed additional duties, she answered "No." Later, when asked about this same issue, Ms. Selmon admitted that her first statement was not true, that she also acted as licensed pharmacy technician, that this was an additional role she played in the pharmacy.

*The Testimony of Ms. Selmon*

Regarding the agreement between Mr. Ajileye and Defendant, Ms. Selmon testified that Defendant authorized Mr. Ajileye to open a bank account to manage the pharmacy. Ms. Selmon testified that, at Mr. Ajileye's instruction, she opened an account in her name, but ran the account as instructed by Mr. Ajileye.

Ms. Selmon testified that Mr. Ajileye held himself out to the public as "Dr. Sammy Lewis" and that he would lie to those that would ask, including people who worked at Accent Pharmacy 1, stating that he was a doctor and that he had been to school.

Ms. Selmon initially stated that Defendant "knows that [Mr. Ajileye is] not a licensed doctor," and that he knows this "[t]hrough conversation." Ms. Selmon later testified that she had no knowledge of how Mr. Ajileye presented himself to Defendant. When asked if Defendant knew that Ms. Selmon was not a licensed pharmacy tech, she answered that "Sammy and him may have discussed that I needed to pursue a license, because I attempted to get a license. So through conversation with Sammy, he would have known that I was not licensed." Ms. Selmon stated that Defendant did not discuss with her a license, but she did not actually testify to personal knowledge that Defendant knew of her status, merely that it was possible Defendant discussed the issue with Mr. Ajileye, and a conclusory statement that, therefore, he certainly knew.

Ms. Selmon testified that Mr. Ajileye began representing to others in public that he was a doctor some time before Defendant and Mr. Ajileye met, and before Defendant and Mr. Ajileye formed an agreement to buy out the pharmacy. Ms. Selmon stated that this agreement was not merely an oral agreement, but a written and signed agreement to open the business. Ms. Selmon stated that she was present in January 2012 when they made the agreement. Ms. Selmon testified that they were inside Accent Pharmacy in Carrollton on Old Denton Road when they signed the agreement, but she later changed her recollection, stating that she did not know if they signed it in her presence, but she was aware that they had a written agreement and that Mr. Ajileye physically maintained the written agreement. She stated that she never told the Government about this signed agreement because it never came up. As previously discussed, no such agreement was ever produced, and the Government stated it had no knowledge of such a written agreement.

Later, Ms. Selmon testified that Mr. Ajileye could have told Defendant "that he was a pharmacist, he could have told him he was a doctor, he could have told him he was someone with some type of degree of some sort. I'm not sure how he introduced himself to [Defendant] or how the pharmacy even came about."

Ms. Selmon testified that around the time she set up a new bank account to run the pharmacy with Mr. Ajileye, Defendant no longer came in regularly to the pharmacy. Although testifying as to communication of Defendant and Mr. Ajileye regarding the filing of prescriptions when Mr. Ajileye had a question, Ms. Selmon stated that she did not come into the pharmacy on a daily basis. She stated that she only worked at the pharmacy two or three days a week, part-time. She also testified that at the time of the opening of the Capital One bank account, Defendant instructed that there had to be licensed pharmacist at the pharmacy or his license would be on the line. Ms. Selmon testified that she merely overheard Defendant say that if inspectors stopped by the pharmacy when Defendant was not there, to say that he was out to lunch or to come back tomorrow. Ms. Selmon testified that she knew of, but had not seen, a change in pharmacist-in-charge form that Defendant had presented to Mr. Ajileye. Further, she testified that Mr. Ajileye hired several licensed pharmacists to act as the pharmacist-in-charge for a time.

Ms. Selmon testified that, using the pharmacy account and her signature on the checks, Mr. Ajileye purchased and used a Maserati, a Hummer, an armored limousine, and an approximately $300,000 house. Ms. Selmon stated that for the most part she signed the checks, but if she was not around Mr. Ajileye would probably forge her signature.

Ms. Selmon spoke to the credibility of Mr. Ajileye. Though she was married to him for six or seven years, she stated she did not know his true name, that he lied regarding his country of origin, that he came to the United States illegally under a false identity, and that he lied to her

for years. Ms. Selmon confirmed that Mr. Ajileye is very convincing, that people fall for his false presentations, and that in fact she still does not know who he is or where he is from.

Speaking as to her own credibility, Ms. Selmon testified that in accepting the "agreement" with Government, it "was an agreement that I agreed upon because I haven't been in a scenario or situation like this. So when you're telling me that I agreed upon something, I mean, that I agreed with the charges or what have you, I just took what I thought was – would be suitable for me so that I won't just have to go on with this trial or situation." Further, Ms. Selmon testified that she lied in an affidavit, claiming to be the co-owner of Accent Pharmacy 1, when she was not.

*Weight of the Evidence*

The Court finds there to be exceptional circumstances at play regarding the weight of the evidence in this case. Parts of Ms. Selmon's testimony could be corroborated regarding the operation of the pharmacy, particularly, the manner in which Mr. Ajileye presented himself as a doctor to the public, that Defendant practically transferred operations to Mr. Ajileye around the time that Ms. Selmon opened the Capital One bank account, and that Defendant was not often present at the pharmacy after this time. The testimony, and the additional evidence, however, lacks support for the contention that Defendant possessed the specific necessary *mens rea* for the charged conspiracy. Ms. Selmon's testimony was, on its face, often based on things she asserted to be true, but that she acknowledged she did not actually perceive first-hand; namely, when Defendant came to know Mr. Ajileye was not a licensed doctor or that Defendant knew that Ms. Selmon was not a pharmacy technician. Ms. Selmon stated that Defendant knew "through conversation" that Mr. Ajileye was not a licensed doctor, and yet contended that it was a possibility that Defendant, at least up until the time of presenting of a change in pharmacist-in-charge form, understood that Mr. Ajileye was a pharmacist. Ms. Selmon initially stated that she did not even work as a pharmacy technician, but rather as a cashier, filing, and answering

phones.  Ms. Selmon testified to the existence of a written agreement which she witnessed being signed at the pharmacy, and then stated that she was not sure that they signed it in front of her, and that she was not even sure how the pharmacy came about.

Defendant admits knowing of unlicensed employees, but even considering intent to circumvent administrative penalties, Ms. Selmon testified that Defendant presented Mr. Ajileye with a change in pharmacist-in-charge form and instructed that Mr. Ajileye would need to get a pharmacist-in-charge at the pharmacy, undercutting any intent to further operate outside of Texas State Board of Pharmacy and DEA regulations.   Ms. Selmon testified that two licensed pharmacists were in fact employed for a time at Accent Pharmacy, to act as pharmacist-in-charge.  Though evidence was not presented to corroborate the hiring of licensed pharmacists, Ms. Selmon's testimony suggests that she and Mr. Ajileye presented to others that licensed pharmacists were working at Accent Pharmacy 1.

Ms. Selmon did not testify that Defendant had any agreement with Mr. Ajileye other than to run the pharmacy, as a pharmacy, with a pharmacist-in-charge.   She claimed to have overheard Defendant at one time instruct that, if inspectors came, to say he was out to lunch or would be back the next day, but she did not testify that this was a standing order or an intended behavior for the future.  Nothing in Ms. Selmon's testimony demonstrated that Defendant agreed to further the unlawful purpose of the criminal conspiracy, not the ends—the vehicles and cars purchased with money from the pharmacy—nor the means—the filling of invalid prescriptions and the illegal distribution of Hydrocodone.   She testified that she did not know about Mr. Ajileye's connections in Houston, any sales of pills on the street, or facts about possible break-ins other than that she reported a few.

This is not a case wherein the Court calls into question and discounts the credibility of a witness whose testimony, if believed, would fully demonstrate the Defendant's guilt beyond a reasonable doubt; the weight of all the evidence presented does not support, beyond a reasonable

doubt, that Defendant had intent to agree to illegally distribute Hydrocodone with Ms. Selmon and Mr. Ajileye.

As the Court charged, a conspirator need not know all the details of the unlawful scheme, but he must understand the unlawful nature of a plan or scheme and knowingly and intentionally join in that plan or scheme. "The essence of conspiracy under section 846 is an agreement to violate the narcotics laws. The government is not required to prove that [an alleged conspirator] had knowledge of all the details of the conspiracy, only that [the alleged conspirator] had knowledge of the essential object of the conspiracy." *United States v. Davis*, 666 F.2d 195, 201 (5th Cir. 1982) (citations omitted). "The defendants must be aware of the essential nature and scope of the enterprise and intend to participate…. 'The essence of conspiracy is *agreement*; (n)obody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it.'" *United States v. Jordan*, 627 F.2d 683, 686 (5th Cir. 1980) (citing *United States v. Conroy*, 589 F.2d 1258, 1269 (5th Cir. 1979)) (emphasis added).

The great weight of the evidence supports that Mr. Ajileye convincingly held himself out as "Dr. Sammy," and even though Ms. Selmon asserted that "through conversation" Defendant knew Mr. Ajileye was not a licensed doctor, it was a possibility, according to Ms. Selmon, that Defendant believed Mr. Ajileye was a pharmacist for some portion of their relationship, including the time period during which Mr. Ajileye took over primary operations of Accent Pharmacy 1. Further, the weight of the evidence suggests that Defendant attempted to change the pharmacist-in-charge and insisted that a pharmacist-in-charge be present at all times.

The weight of the evidence only supports an "agreement," upon discovery of a failure to be properly licensed, not to reveal to the Texas State Board of Pharmacy and DEA that Mr. Ajileye and Ms. Selmon were unlicensed, and/or an agreement not to reveal that, when listed as pharmacist-in-charge of Accent Pharmacy 1 and 2, Defendant was not properly overseeing the pharmacies both in physical presence and in oversight of employees. Both of these

"agreements," however, are not directed toward the unlawful purpose of the charged conspiracy—to profit from the illegal purchase and distribution of Hydrocodone—but to facilitate the continued operation of Accent Pharmacy 1 as a legitimate pharmacy in spite of improper oversight and licensing standards.

The weight of the evidence, including Ms. Selmon's testimony, supports that Defendant exceeded his physical capabilities and failed to meet his obligations in attempting to work a full-time job, to manage ownership of Accent Pharmacy 1 and start Accent Pharmacy 2, and so agreed to have Mr. Ajileye run Accent Pharmacy 1 as a typical pharmacy, gave Mr. Ajileye permission to run the finances and operations without proper oversight, and intended, but failed to get a licensed pharmacist-in-charge to take over his responsibilities at Accent Pharmacy 1.

The Court finds that the evidence supports that criminal conduct did occur at Accent Pharmacy 1, and this conduct involved the ordering of excessive quantities of Hydrocodone, the distribution of Hydrocodone to individuals without valid prescriptions, and the profiting based on sales that would not be allowed to take place in a properly run pharmacy. The weight of the evidence supports the conclusion that this was a conspiracy that resulted in the purchase of a nearly $300,000 house and multiple vehicles including a Hummer, a Maserati, and an armored limousine, all of which came to be possessed by Mr. Ajileye, and to a lesser degree, Ms. Selmon.

The Government argues that it makes no difference how the proceeds of the conspiracy are distributed, or if the conspirators had some other *quid pro quo*, and yet courts and juries certainly look to the potential for gaining profits from the illegal purpose of a conspiracy as evidence of an alleged conspirator's intent. S*ee, e.g. United States v. Casto*, 889 F.2d 562, 565 (5th Cir. 1989) (". . . that [defendant] entered freely into the conspiracy with the intent of gaining cash and drugs for herself . . ."). Here, the weight of the evidence suggests that Defendant did not profit from the conspiracy to illegally distribute Hydrocodone, but rather the profits flowed

to Ms. Selmon and Mr. Ajileye, suggesting a lack of intent on Defendant's part to participate in the charged conspiracy.

"Although the district court has broad discretion to decide a motion for new trial," the Court understands that "it may not grant the motion unless the evidence preponderates heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand." *See United States v. Fuchs*, 467 F.3d 889, 910 (5th Cir. 2006). The Court recognizes that there is some evidence that could support the charged crime, but to hold the Defendant responsible for a conspiracy when the weight of the evidence suggests criminal behavior was committed in accordance with an agreement between Mr. Ajileye and Ms. Selmon, and the weight of the evidence does not support that Defendant possessed the intent to willfully join in that agreement would be a miscarriage of justice.

It is possible that Defendant was aware of the nature of the conspiracy, and that he willfully entered into an agreement to further the purpose of the conspiracy, but the weight of the evidence presented at trial preponderates against this conclusion, and certainly preponderates against a verdict of a finding beyond a reasonable doubt.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion for New Trial (Dkt. #115) is hereby **GRANTED**.

It is further **ORDERED** that Defendant's Motion and Brief for Judgment of Acquittal Rule 29(a) and (c), Fed. R. Crim. Proc. (Dkt. #114) is hereby **DENIED** as moot.

**SIGNED this 17th day of August, 2016.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE